**CONTINENTAL CASUALTY COMPA-NY, an Illinois corporation, Plaintiff–Appellant,**

**v.**

**SOUTHWESTERN BELL TELEPHONE COMPANY, a Missouri Corporation, Defendant–Appellee.**

No. 86–1281.

United States Court of Appeals, Tenth Circuit.

May 31, 1988.

Rehearing Denied Oct. 18, 1988.

Michael Minnis of Pierson, Ball & Dowd (David McCullough of Pierson, Ball & Dowd, Oklahoma City, Okl., and David Machanic and Michael Curtis of Pierson, Ball & Dowd, Washington, D.C., with him on the brief), Oklahoma City, Okl., for plaintiff-appellant.

Andrew M. Coats of Crowe & Dunlevy (Larry E. Joplin, Wesley C. Fredenburg, and Robert G. McCampbell, with him on the brief), Oklahoma City, Okl., for defendant-appellee.

Before SEYMOUR and McWILLIAMS, Circuit Judges, and SAFFELS, District Judge *.

SAFFELS, District Judge.

Plaintiff/appellant Continental Casualty Company (CNA) filed this lawsuit against Southwestern Bell Telephone Company (Southwestern Bell), stating causes of action for libel and tortious interference with contract based on statements published by Southwestern Bell to the effect that CNA denied valid insurance claims on numerous occasions. Immediately prior to trial, the district court held that the statements were not libel per se, and the trial proceeded under a libel per quod theory. The jury subsequently returned a $21,423.00 compensatory damage verdict in CNA's favor on the tortious interference with contract claim, but it found for Southwestern Bell on the libel claim. CNA appeals the adequacy of the damages and alleges various errors by the trial court. For the reasons below, we reverse and remand for a new trial on several issues.

## I.

In addition to using its own in-house labor, Southwestern Bell regularly employs independent contractors to place underground cable for new telephone users in the Oklahoma City, Oklahoma area. A prerequisite for receiving a cable-laying contract from Southwestern Bell is the purchase of insurance by the contractor to cover claims against the contractor or Southwestern Bell arising from the cable-laying operations. Southwestern Bell required all such independent contractors to purchase an Owner's and Contractor's Protective (OCP) policy. In an OCP policy, Southwestern Bell is the insured entity. The independent contractor was also required to purchase a General Liability (GL) policy, naming itself as the insured. Southwestern Bell required that the OCP and GL policies be issued by the same insurance carrier.

CNA was one of the insurance carriers that provided OCP and GL policies to Southwestern Bell's independent contractors. Southwestern Bell representatives testified at trial that from 1981 to 1983, they experienced difficulties in dealing with CNA, particularly in CNA's handling and approval of claims under the policies. In February 1983, Ken Felker, head of Southwestern Bell's claims department, wrote an internal memorandum to Bob White, chief of the plant division, in which he recommended that bids no longer be accepted from independent contractors who were insured with CNA. The memorandum contained the following remarks:

"Since the Claims Office opened for business in October, 1981, we have handled numerous cases where our outside contractors have damaged our customer's property. As a general rule, the insurance carriers for these contractors have responded promptly and resolved those claims that are legitimate.

One exception to this has been Continental Casualty Company (CNA). On numerous occasions they have denied valid claims, ignored claimants, refused to cooperate with us, etc. We have been exposed to potential lawsuits and our reputation as a responsible corporate citi-

nation.

---

* Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by desig-

zen has been damaged because of CNA's attitude and methods.

"For these reasons, we strongly recommend that bids no longer be accepted from contractors who are insured by CNA."

Plaintiff's Exh. 10. White repeated these statements verbatim in a memorandum distributed to various divisions within Southwestern Bell. Plaintiff's Exh. 6. Upon receiving the White memorandum in early March, 1983, the managers of several Southwestern Bell divisions sent letters to cable-laying contractors, informing them that bids would no longer be accepted from contractors who are insured by CNA. Some of these letters incorporated verbatim the language from the Felker and White memorandums. *E.g.*, Plaintiff's Exh. 2.

Upon learning of Southwestern Bell's intent to cease accepting bids from contractors carrying insurance with CNA, many cable-laying companies canceled their CNA policies. Shortly thereafter, CNA filed the present lawsuit for damages arising from Southwestern Bell's allegedly libelous statements and its interference with contractual relations between CNA and its insureds. The jury found for CNA on its contractual interference claim, awarding it $21,423.00 in compensatory damages. The jury returned a verdict in Southwestern Bell's favor on the libel claim. CNA moved for a new trial on the issue of damages, claiming that the verdict was inconsistent with the evidence. CNA expressly reserved the right of appeal on other alleged errors. The district court denied the motion.

On appeal, CNA makes three principal arguments: (1) It is entitled to a new trial because the damage award was so low that the verdict was, on its face, inconsistent with the evidence; (2) The district court erred in finding that the statements contained in the memorandums and letters were not libel per se and in admitting certain evidence supporting Southwestern Bell's defense of truth; and (3) The district court erred in permitting a Southwestern Bell witness to testify, to qualify as an expert, and to use exhibits that were not listed in the pretrial order. We address these arguments in turn.

## II.

CNA's first claim of error relates to the adequacy of the jury verdict on the tortious interference with contract claim. CNA contends that the amount of damages awarded by the jury on this claim was so low that the verdict was, on its face, inconsistent with the evidence at trial. CNA's branch manager, Bob Blessing, testified at trial that as a result of Southwestern Bell's damaging statements, CNA lost 467 insurance policies that generated $776,609 in annual premiums. R.Supp. Vol. VI at 419; Plaintiff's Exh. 53. The controller of CNA, Dennis Chookaszian, testified that Southwestern Bell's actions conservatively caused a loss of $1.159 million in profits, reduced to present value and assuming a ten-year renewal limit. R.Supp. Vol. VIII at 711–20; Plaintiff's Exh. 57. Southwestern Bell's own expert, John Fitzgerald, testified that, assuming liability, total damages should be a present value figure of $83,255. R.Supp. Vol. X at 1189–204. Fitzgerald used a five-year term but stated that three years would have been a more accurate period. *Id.* at 1204. Therefore, if the jury followed Fitzgerald's testimony, it could have awarded damages in the neighborhood of $55,000 to $83,255. The actual award was $21,423.00.

We have stated that "[a] motion for new trial on the grounds that the jury verdict is against the weight of the evidence normally involves a review of the facts presented at trial, and thus involves the discretion of the court." *Black v. Hieb's Enter., Inc.,* 805 F.2d 360, 363 (10th Cir.1986). Our review focuses on whether the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence, with the trial court's decision to stand absent a showing of a manifest abuse of discretion. *Id.* "The amount of damages awarded by the jury can be supported by any competent evidence tending to sustain it, and '[o]ur appellate function is completed when we are convinced that an evidentiary basis

in the record supports the jury's verdict.'" *Id.* (quoting *Bennett v. Longacre,* 774 F.2d 1024, 1028 (10th Cir.1985)). *See also, Hudson v. Smith,* 618 F.2d 642, 646 (10th Cir. 1980) ("A jury's verdict regarding the amount of damages should be upheld unless it is clearly erroneous, or there is no evidence to support it.").

In its brief, CNA formally propounded only the argument that the verdict was against the weight of the evidence, but it also made statements to the effect that the verdict was "facially inadequate," which is a separate legal theory upon which to attack an award. A trial judge's determination of the adequacy of a jury award is also reviewed under the abuse of discretion standard. *Black,* 805 F.2d at 362. No abuse of discretion will be found "unless the verdict is so inadequate 'as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial.'" *Id.* (quoting *Bennett v. Longacre,* 774 F.2d 1024, 1028 (10th Cir.1985)). "Absent such a showing of passion or prejudice, the jury's finding on damages is considered inviolate." *Black,* 805 F.2d at 362.

The damage figure awarded by the jury is not so inadequate as to raise an inference of passion or prejudice, and CNA has offered no objective evidence in support of such a finding. Under the standard in *Black,* the court cannot find that the award is so inadequate as to require a new trial. But after a study of the record, the court has reached the inescapable conclusion that the jury's damage award is clearly, decidedly and overwhelmingly against the weight of the evidence, such that the trial judge abused his discretion in not granting a new trial. In arriving at this result, the court has considered each argument made by Southwestern Bell in support of the award and has found uncontroverted evidence to the contrary in the record.

Southwestern Bell first argues that because the contracts in question were of one year's duration, the jury could have returned a damage estimate as low as $17,227. Dr. Fitzgerald, defendant's expert, noted that although the independent contractors canceled CNA policies of approximately $775,000 in premium value shortly after the release of the disparaging statements, CNA refunded only $287,000 in unused premiums. This was their actual loss in premium dollars on contracts then in existence. Fitzgerald assumed a six-percent profit figure and opined that the loss in profits was $17,227 for those contracts. R.Supp. Vol. X at 1202.

An award of $17,227 would have necessarily assumed that none of the contractors (who among them held 467 policies consisting of worker's compensation, automobile, general liability, and OCP policies) would have remained insured with CNA even without having learned of Southwestern Bell's intent to blackball CNA-insured businesses. In other words, an award in the neighborhood of $17,000 would have to have assumed that each of the independent contractors would choose not to renew their CNA policies for reasons wholly unrelated to the Southwestern Bell letters. The uncontroverted testimony established that contractors stay with a particular insurance company for an indeterminate amount of time. Fitzgerald's own testimony was that a particular contractor may stay with a particular insurance company "for one year, probably two, and more likely three." *Id.* at 1198. Plaintiff's evidence showed that it had progressively captured more of the general contractor insurance market, going from one cable layer in 1977 to 114 in 1983. R.Supp.Vol. VIII at 710. No evidence was offered to indicate that the trend would not continue. We can find no basis for the first argument.

Defendant's second argument is that Fitzgerald's testimony supported a *maximum* award of $83,255, and five variables could have been employed by the jury to arrive at a much smaller figure. We will deal with these variables in turn:

  (1) "not all of the contracts cancelled were necessarily cancelled as a result of any action by Southwestern Bell."

While the evidence does not establish the motivation of every independent contractor in canceling their CNA policies, plaintiff's

exhibit 53 shows the following: Within one week of releasing the strong-arm letter, 105 policies were canceled; within two weeks, 288 policies; three weeks, 334 policies; one month, 357 policies; and two months, 393 policies. By 1984, CNA insured *no* cable layers. R.Supp.Vol. V at 167. Other testimony, including that of the independent insurance agents who dealt directly with the contractors, established that the majority, if not the totality, of cancellations were directly related to Southwestern Bell's actions. *E.g.*, R.Supp.Vol. V at 214, 221; R.Supp.Vol. VI at 403–13. Southwestern Bell offered no testimony concerning cancellations that were unrelated to its actions. Whatever number of cancellations might theoretically be attributed to causes other than the damaging statements, the record fails to support defendant's argument.

    (2) "CNA's Oklahoma City branch, due to Oklahoma's poor economy, probably had a profit rate less than CNA's nationwide experience"

In arriving at the figure of $83,255, Fitzgerald assumed a profit rate of 6% arrived at by an average of CNA's national profit rates in 1982(7%), 1983(7%), and 1984(4%). At the time of trial, in September 1985, CNA's profits were running at a rate of 15% for 1985 and had historically been in the 10% range, but this was not factored into the $83,255. Southwestern Bell contends that the jury could have used a rate as low as 3% in determining damages, but does not support the 3% figure from the record. The lowest estimate given the jury was the 6% offered by Fitzgerald. His testimony was that a 6% figure is "fair." R.Supp.Vol. X at 1202. Furthermore, we cannot find in the record that Southwestern Bell ever submitted testimony comparing a profit rate in Oklahoma with CNA's nationwide performance or establishing any relationship whatsoever between the rate of profit and the economy. This second variable supports but a minimal fluctuation in the damage figure, if indeed it supports any at all.

    (3) "because, as shown by its own internal records, CNA's Oklahoma City branch systematically mishandled

claims, much of CNA's drop in business would be attributable to that circumstance"

This argument was addressed in (1) above. Southwestern Bell apparently presented no evidence supporting this as a reason for cancellations. The only evidence in the record establishes that most, if not all, loss in cable-layer insurance was directly related to Bell's conduct.

    (4) "Bell employed fewer independent contractors in 1983"

The evidence does establish that Bell decreased its use of outside contractors for cable-laying operations, but several matters in the record diminish the weight of this fact. First, the type of policies *required* of independent cable-laying contractors by Southwestern Bell were the OCP and GL policies. Of the $775,000 in CNA's lost premiums from these contractors, only $13,500 was for OCP policies and $200,000 for GL policies. The evidence showed that an OCP was a relatively inexpensive insurance policy, with the main insurance business coming from the general liability, automobile, and worker's compensation policies purchased by the contractors. Therefore, a loss in cable-laying business precipitated by Bell's decrease in demand certainly does not support a corresponding and proportionate loss in overall premium income. Second, the perhaps temporary decrease in demand by Bell for independent cable-laying contractors could have very little impact on the actual purchase of insurance, for this reason. Bell informed the independent contractors that their *bids* would not even be accepted if their insurance carrier was CNA. Thus, at any one point in time, regardless of the condition of the market for cable-laying companies, the independent contractors will not carry CNA insurance for fear that if a cable-laying job opens up, they will not be qualified to participate in the bidding process. Defendant's fourth variable carries very little weight.

    (5) "the contracts at issue were each for one year's duration"

This variable was dismissed above as without significance.

Viewing defendant's alleged potential variations as a whole, we are compelled to find that the overwhelming evidence requires a verdict much in excess of $21,423. While the record might permit some slight fluctuation from the $83,255 figure, the actual award is grossly at odds with the evidence. Of particular importance is defense expert's calculation of $17,227 as the damages merely for the undisputed loss of the initial partial year of premiums. This figure taken alone assumes continuation of *none* of the 114 cable-laying companies carrying 467 policies with CNA. Considering that CNA was steadily increasing its share of this market and that many contractors carry a particular insurance company for three or more years, the addition of barely $4,000 for *all* future losses arising from the cancellations precipitated by Southwestern Bell is decidedly against the weight of the evidence. The district court abused its discretion in denying CNA's motion for new trial on the issue of damages.*

## III.

■ The second claim of error is based on the district court's determination that Southwestern Bell's statements were not libel per se. Immediately before the trial began, the district court ruled from the bench that the alleged defamatory statements were not libel per se. The court memorialized its ruling without explanation in an order dated October 18, 1985. Because the issue of whether a statement is libelous per se is one of law for the court, *Akins v. Altus Newspapers, Inc.*, 609 P.2d 1263, 1267 (Okla.), *cert. denied*, 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980), our review of the district judge's order is de novo.

In Oklahoma, actions for libel are statutorily defined. The statute reads as follows:

> Libel is a false or malicious unprivileged publication by writing ... which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation....

Okla.Stat. tit. 12, § 1441 (1986). Statements alleged to be libelous fall into three categories under Oklahoma law: (1) those not of defamatory meaning; (2) those reasonably susceptible of both a defamatory and an innocent meaning (known as libel per quod); and (3) those clearly defamatory on their face (libel per se). *Sellers v. Oklahoma Publishing Co.*, 687 P.2d 116, 119–20 (Okla.1984). The Oklahoma Supreme Court recently examined the concept of libel per se in the context of a plaintiff business:

> "In order that words shall be libelous per se as disparaging a person in his trade or business, they must have been spoken of plaintiff in relation thereto, and be of such a character as would prejudice him by impeaching either his skill or knowledge, or attacking his conduct in such business."

*McCullough v. Cities Serv. Co.*, 676 P.2d 833, 834 (Okla.1984) (quoting *Kee v. Armstrong, Byrd & Co.*, 75 Okl. 84, 182 P. 494 (1919)).

The question facing us is whether a false statement to the effect that an insurance company has, on numerous occasions, denied valid claims attacks the company's conduct of its business. We find that it does. Such a statement undermines the very essence of the service that an insurance company provides. Businesses and individuals purchase insurance for the ultimate purpose that upon the occurrence of a valid claim, a loss will be covered by the insurance company. Indeed, the court can

---

* Southwestern Bell argues that CNA waived its objection by failing to contest the district court's response to a note from the jury. During its deliberations, the jury submitted this question to the court: "Instruction 15, Paragraph 3 says '... so long as a reasonable basis for such estimate or approximation is shown with reasonable certainty.' Should we document any method we use to determine any dollar amounts?" The parties and the court agreed upon the following response: "In response to your first question, you are advised that the jury is not required to document the method by which any such dollar amounts are determined." We believe that the court's answer to the jury was the correct one and find no waiver on this basis.

think of no greater disparaging remark about an insurance company than an attack against its propensity to honor the insurance contract by paying valid claims. The "natural and probable effect on the mind of the average lay reader," *Sellers*, 687 P.2d at 120–21, is that CNA is an insurance company to be avoided. Indeed, the subsequent loss of *every* cable-laying contractor was the logical and intended result of the statement, and it bears witness to the fact that the libelous words "tend[ed] to lower plaintiff in the estimation of men whose standard of opinion the court can recognize." *Fite v. Oklahoma Publishing Co.,* 146 Okl. 150, 293 P. 1073, 1077 (1930). No other circumstances or facts are needed for the reader to understand the full import of the statement. Southwestern Bell's statement was clearly defamatory on its face, rendering it libel per se under Oklahoma law.

In its instructions from the bench, the district court stated that for CNA to recover on its libel claim, it must prove the following elements: "(1) The defendant made a written statement about the plaintiff; (2) That the [sic—the word "statement" was either mistakenly not transcribed or was omitted by the district judge] was false; (3) The statement was defamatory in nature; (4) That the statement was published to a third party; and (5) As a result of the statement, the plaintiff suffered specific and identifiable damages." R.Supp.Vol. X at 1361. We have previously noted that under Oklahoma law, "one who is liable for a per se libel or slander is liable for both general and special damages." *M.F. Patterson Dental Supply Co. v. Wadley,* 401 F.2d 167, 172 (10th Cir.1968). *See also Akins v. Altus Newspapers, Inc.,* 609 P.2d 1263, 1267 & n. 4 (Okla.) (agreeing with *M.F. Patterson* ), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980).

■ The procedural significance between libel per se and libel per quod is that if the defamation is actionable per se, the defendant can be liable without proof of special damages, *see* Restatement (Second) of Torts § 569 (1977), while an action for

libel per quod "is dependent on allegation of special damages." *Sellers,* 687 P.2d at 121. Special damages are actual subjective losses, *i.e.,* out-of-pocket losses. They consist of damages that "must be proven by specific evidence as to the time, cause and amount." *M.F. Patterson,* 401 F.2d at 173. Alternatively, general damages encompass "more customary types of actual harm inflicted by defamatory falsehood," including "impairment of reputation and standing in the community." *Akins,* 609 P.2d at 1267. They are a form of compensatory damages imposed for the purpose of compensating the plaintiff for the harm that the defamation has caused to his reputation. There is a presumption of general damage to reputation from a defamatory publication that is actionable per se. Restatement (Second) of Torts § 621, comment a (1977); *see also Akins,* 609 P.2d at 1267 n. 4. Because the district court in the present case required the jury to find actual and specific out-of-pocket losses as an element of plaintiff's libel claim, R.Supp.Vol. X at 1364 (which in turn resulted from its finding that the statement was not libel per se), it prevented the jury from finding for plaintiff solely on the basis of general damages. This was reversible error, and plaintiff's motion for new trial on its libel claim must be sustained.

The court finds no merit in plaintiff's remaining allegations of error, including the district court's decision to permit Fitzgerald's testimony, to qualify Fitzgerald as an expert, to admit certain exhibits in support of Fitzgerald's testimony, and to admit certain evidence in support of Southwestern Bell's defense of truth. The orders of the district court on these matters shall be affirmed.

## IV.

In summary, concerning plaintiff's tortious interference with contract claim, we conclude that the trial court abused its discretion in denying the motion for new trial on the issue of damages, based on our finding that the jury's award of damages was against the weight of the evidence. We also conclude that the trial court com-

mitted reversible error in denying the motion for new trial on plaintiff's libel claim, based on our finding that statements published by Southwestern Bell to third persons were libelous per se under Oklahoma law. Finally, we conclude that the trial court did not commit error in its admission of testimony and exhibits at trial.

We therefore set aside the jury's verdict on (1) the damages that resulted from Southwestern Bell's tortious interference with contract and (2) the libel claim, and remand to the district court for a new trial on these issues. We affirm in all other respects.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.